# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2107 North Avenue<br>Richmond, VA 23222, a multi-level, single family dwelling,<br>with beige siding, and white trim | Case No. Under Seal 3:19SW205 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a) and 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Reviewed by AUSA/SAUSA:

Janet Jin Ah Lee

Anthony Brock Newton Kathryn Simmons Special Agent (ATF)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 07/16/2019

/S/
David J. Novak
United States Magistrate Judge
*Judge's signature*

City and state: Richmond, Virginia

Honorable David J. Novak, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>**2107 North Avenue<br>Richmond, VA 23222, a multi-level, single family dwelling, with beige siding, and white trim** | **Under Seal**<br><br>Case No. 3:19-sw- 205 |

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Kathryn Simmons, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since May 2018. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. As a result of my training and experience as an ATF Special Agent, I am familiar with federal firearm and drug trafficking laws, and I am empowered by law to conduct investigations of, and make arrests for, such offenses.Based on my training and experience as a Special Agent, I am familiar with federal firearm and drug trafficking laws, and am empowered by law to conduct investigations of, and make arrests for, such offenses.

2. Prior to my experience with ATF, I spent approximately six years as an Identity Intelligence Exploitation Analyst for the United States Special Operations Command (USSOCOM) supporting forward Special Operations Forces (SOF). I worked in analysis of identity intelligence to create products, such as reporting on facial recognition, fingerprint matches, DNA analysis, iris scans, cellular phone and media exploitation, and networking analysis. I created intelligence reports and briefed command staff on a routine basis. These

1

intelligence products were used to support forward deployed soldiers in investigations and prosecutions involving violent extremist organization networking, identifying improvised explosive device manufacturers, and working on locating and identifying specific terrorists.

3. The following affidavit is based on my personal experience and involvement in this ongoing investigation, my conversations with other law enforcement officers, as well as my examination of documents and evidence related to this case. The following statements are true and correct to the best of my knowledge.

4. I submit this affidavit in support of an application for a search warrant for a residence located at, 2107 North Avenue, Richmond, VA, 23222, which is a two-story, single family dwelling, with beige color siding with white trim, and a porch with black handrails along the front side, (hereinafter "PREMISES") as described in Attachment A, incorporated by reference herein.

5. Based upon the facts set forth herein, I submit there is probable cause to believe that ROGER WIGGINS and RICHARD WILLIAMS, have engaged in a conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 841(a) and 846, and that the property described in Attachment A contains evidence, contraband, fruits, and/or instrumentalities of these criminal activities, as described in Attachment B, incorporated by reference herein.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

a. Drug traffickers often maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code. That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where drug traffickers have ready access to them, including but not limited to residences, offices, vehicles, cell phones, and storage facilities;

b. Drug traffickers commonly maintain addresses and telephone numbers in books, papers, and electronic data storage devices which reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization;

c. Drug traffickers commonly utilize telephones, both residential and cellular, as a means of communications to conduct their trafficking business;

d. Drug traffickers often maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their ongoing drug business, or as proceeds.

e. Drug traffickers frequently take photographs/videos of themselves, their co-conspirators, their property, their firearms; and, these traffickers usually maintain these photographs/videos in their residences, offices, and other places under their control;

f. Drug traffickers often purchase expensive vehicles, businesses, and residences with the proceeds from their drug transactions, and they often keep these items registered in the names of other individuals in order to avoid discovery by law enforcement;

g. Drug traffickers commonly possess/deal firearms in exchange for drugs, and these firearms/ammunition are used by drug traffickers as an item of investment, intimidation, and for protection from robberies by other traffickers or customers;

h. Individuals involved in the illegal distribution of controlled substances often use computer equipment to document and track their business affairs;

i. Drug traffickers often secure contraband, proceeds of narcotics sales, and records of drug transactions, drug sources, and customers in secure locations within residences, sheds, businesses, garages, storage buildings, safes, safe deposit boxes, and vehicles in order to conceal such items from law enforcement;

j. Drug traffickers often keep paraphernalia for cutting, weighing, packaging, manufacturing, and distributing controlled substances;

k. The courts have recognized that unexplained wealth is evidence of a crime motivated by greed, in particular, trafficking in controlled substances;

l. Drug trafficking is a continuing activity over months and even years. Drug traffickers will repeatedly obtain or manufacture and then distribute drugs on somewhat a regular basis, such as any distributor of a legitimate good. Traffickers will have an inventory, which will fluctuate in size, depending on demand for the product. Traffickers will keep records of their illegal activities, for example, a ledger to show money owed to them and owed to others, for months or years beyond the time during which they actually possess illegal drugs, in order to maintain contact with their criminal co-conspirators and associates for future transactions;

m. Drug traffickers often use drugs that they traffic and/or manufacture; and it is not unusual to find personal use quantities of drugs and paraphernalia on their person and on their property.

## PROBABLE CAUSE

8. On January 16, 2019, a subject who later became known as ATF CI-3 was arrested by the HCPD for possessing approximately 5.3 grams of suspected heroin. CI-3 is a convicted felon.

9. In a later debrief of CI-3, CI-3 stated that the heroin in his possession on January 16, 2019 was fronted to him by WIGGINS. CI-3 stated that he has known WIGGINS for approximately 20 years and has been using approximately two (2) grams of heroin on a daily basis and as much as three (3) grams of crack cocaine on a daily basis. CI-3 stated that his main source of heroin is WIGGINS and that WIGGINS is normally present at 2003 Barton Avenue. CI-3 stated that there is a firearm in the shed at 2003 Barton Avenue and "everything happens in the shed."

10. CI-3 stated that WIGGINS was supplying him on a daily basis and that he would in turn distribute to other users while using some of the heroin for himself. CI-3 stated that WIGGINS also sells cocaine. CI-3 stated that WIGGINS was living in Charlottesville, VA and commuting to Richmond, VA. CI-3 stated that WIGGINS was traveling to Baltimore, MD to obtain a "Big 8" amount of heroin. CI-3 did not know what amount of heroin consisted of a "Big 8." CI-3 further stated that Roger Lee GIBBONS (WIGGINS' father) also sells heroin.

<u>Communications Between CI-3 and WIGGINS</u>

11. CI-3 provided text messages to law enforcement of conversations between CI-3 and WIGGINS from the end of December 2018 through January 2019. On December 31, 2018, in one text message exchange, WIGGINS sent a message to CI-3 stating, "Do you need to see me before I go." CI-3 stated that this text message exchange referenced WIGGINS asking CI-3 if he needed to see WIGGINS' reference heroin.

12. On January 9, 2019, WIGGINS sent the following messages to CI-3: "Hey babe I'm getting short I just promised to call you ahead of time text me back. If not I should be ready again before Friday. I'm in the shed." CI-3 stated that these messages meant that WIGGINS was running out of heroin, and before going to Baltimore, MD, wanted to make sure CI-3 was "straight."

13. On February 11, 2019, in the presence of law enforcement, CI-3 spoke with WIGGINS. During the conversation CI-3 discussed CI-3's drug arrest and how someone broke into his house. The conversation ended with WIGGINS telling CI-3 that he would have to come over and talk to him later.

Controlled Meeting with WIGGINS on 02/22/2019

14. On February 21, 2019, CI-3 placed a recorded phone call to WIGGINS. During this conversation, CI-3 told WIGGINS that he was trying to put something together for WIGGINS and WIGGINS replied by telling CI-3 to come by the house at "3:30." CI-3 did not meet with WIGGINS after this phone call.

15. On February 22, 2019, CI-3 placed a recorded phone call to WIGGINS. CI-3 stated that he wanted to come see WIGGINS and WIGGINS stated that he was at the house. After this phone call, at the direction of law enforcement, CI-3 went to the area of 2003 Barton Avenue to meet with WIGGINS. While at 2003 Barton Avenue, WIGGINS exited the front door

of 2003 Barton Avenue and CI-3 had conversation with WIGGINS. CI-3 discussed his arrest with WIGGINS and WIGGINS asked CI-3 why he rides with the "stuff" on him and told CI-3 that he knew better than to ride with it. WIGGINS told CI-3 that he caught his charge, that he was going to try and help CI-3, and WIGGINS told CI-3 that things would have to be done differently because CI-3 does not listen. WIGGINS stated, "you got what they want...you don't got...they don't got what you want...so at the end of the day if they don't got a ride to you, then they don't get it...they come to you...they come to where you at." WIGGINS further stated, "I'm not going to meet (inaudible) momma or nobody in no types of circumstances no where...I don't care who you may be...period."

16. WIGGINS told CI-3 that he did not want CI-3 coming around the area of 2003 Barton Avenue in any type of way. CI-3 attempted to provide WIGGINS with money CI-3 owed WIGGINS for fronted narcotics; however, WIGGINS did not take the money. During the controlled meeting, WIGGINS spotted law enforcement in the area and made this apparent to CI-3.

### Controlled Meeting with WIGGINS on April 18 and 22, 2019

17. On April 18, 2019, at law enforcement direction, CI-4 made contact with WIGGINS and GIBBONS in the area of 2003 Barton Avenue. During this controlled meeting, while reviewing the electronic surveillance equipment, CI-4 is observed smoking marijuana. On April 23, 2019, CI-4 admitted to law enforcement that he had smoked marijuana. CI-4 explained that smoking marijuana is routine and felt it would have been suspicious if he did not. During the controlled meeting, CI-4 stated that WIGGINS told him he would sell him a "sixteenth for $90." However, law enforcement did not notice this conversation while listening to the electronic surveillance equipment.

7

18. On April 22, 2019, at law enforcement direction, CI-4 made contact with WIGGINS in the area of 2003 Barton Avenue. During the controlled meeting, per the electronic surveillance equipment, CI-4 appeared to prepare a marijuana cigarette and smoke it. On April 25, 2019, CI-4 informed law enforcement that he did smoke marijuana, which was provided to him by another person while he was in the area. Also during this controlled meeting, CI-4 was provided a small amount of what CI-4 believed to be heroin from Devin PERRY and PERRY asked CI-4 to provide it to another individual. CI-4 did provide the suspected heroin to another individual. CI-4 also provided information that WIGGINS was out of cocaine but had "dope."

First Controlled Purchase from Richard WILLIAMS on April 26, 2019

19. On April 18, 2019, CI-3 provided information to law enforcement that he had made contact with GIBBONS at 2003 Barton Avenue. CI-3 knocked on the front door of 2003 Barton Avenue with no answer and then made contact with GIBBONS at the shed. While at the shed, CI-3 described a conversation as GIBBONS "coaching" CI-3 on how to get back into selling heroin. GIBBONS told CI-3 not to "try and get rich", but to "start small". He advised the CI to purchase small amounts of heroin to sell in order to "get back in the game".

20. On April 26, 2019, at law enforcement direction, CI-3 purchased approximately one-half (1/2) grams of suspected heroin and one-half (1/2) grams of suspected crack cocaine from Richard WILLIAMS. At approximately 9:26 a.m., CI-3 arrived in the area of 2003 Barton Avenue and made a phone call to GIBBONS' phone number of (804) 247-4900, which was answered by Richard WILLIAMS. At approximately 9:28 a.m., WILLIAMS was observed via video surveillance in the doorway of the shed behind 2003 Barton Avenue talking on the phone. During the conversation with WILLIAMS, WILLIAMS stated to CI-3, "I'll tell Roger or Lee when I talk to them later and see what time to contact you," and that someone would "holler" at

CI-3 later in the day. Also during the conversation, CI-3 stated to WILLIAMS that he wanted a "half and three for fifty."

21. After this conversation, CI-3 met with law enforcement and CI-3 departed the area. A short time later, CI-3 informed law enforcement that WILLIAMS had called him and was going to be bringing the requested narcotics to him at work. At approximately 9:58 a.m., WILLIAMS was observed exiting the shed behind 2003 Barton Avenue, entering a vehicle, and departing the area. At approximately 11:00AM, CI-3 met with WILLIAMS in the area of 618 2nd Street in Richmond, VA where WILLIAMS provided CI-3 with the purchased suspected heroin and crack cocaine. The suspected crack cocaine was field tested and showed a positive for the presence of cocaine and the heroin was field tested and showed a positive for the presence of heroin.

### Controlled Meeting with WIGGINS on May 1, 2019

22. On May 1, 2019, at law enforcement direction, CI-4 made contact with WIGGINS and WILLIAMS in the area of 2003 Barton Avenue. Furthermore, CI-4 associated with WIGGINS inside the shed located behind 2003 Barton Avenue. While inside of the shed, electronic surveillance equipment captured WIGGINS counting money and conducting suspected narcotics transactions. Per the electronic surveillance equipment, WIGGINS is observed grabbing a dark colored bag and pulling out a clear plastic baggie while talking to an unknown white male. In another instance, WIGGINS retrieved a dark colored bag from a microwave and retrieved something from a clear plastic baggie, which was provided to an unknown male. CI-4 stated to law enforcement that WIGGINS retrieved the narcotics he sold out of the dark colored bag, which is stored inside the microwave.

9

23. CI-4 further communicated to law enforcement that WIGGINS was attempting to provide cocaine to sell to CI-4. However, WIGGINS did not provide any cocaine to CI-4.

### Second Controlled Purchase from WILLIAMS on May 9, 2019

24. On May 9, 2019, CI-3 purchased approximately .52 grams of suspected heroin and .66 grams of suspected crack cocaine from WILLIAMS. After having phone conversation with WILLIAMS and ordering a "half" and "two 20s," CI-3 met WILLIAMS in the alley behind the PREMISES for the transaction. The suspected heroin was field tested and showed a positive for the presence of heroin. The suspected crack cocaine was field tested and showed a positive for the presence of cocaine. Furthermore, the suspected heroin and crack cocaine were analyzed by the DEA laboratory. The suspected crack cocaine was identified to contain cocaine base and the suspected heroin was identified to contain heroin and fentanyl.

### Third Controlled Purchase from WILLIAMS on May 9, 2019

25. On or about May 9, 2019, CI-4 purchased approximately 1.48 grams of suspected heroin from WILLIAMS. Prior to the purchase, CI-4 went to 2003 Barton Avenue in hopes of locating WIGGINS. However, CI-4 was unable to locate WIGGINS or any of WIGGINS' associates. After this, CI-4 traveled to the PREMISES, where he made contact with WILLIAMS and WILLIAMS entered the PREMISES and returned with three (3) small baggies containing heroin and completed the transaction. The suspected heroin was field tested, which showed a positive for the presence of heroin. Furthermore, the suspected heroin was analyzed by the DEA laboratory and identified to contain heroin.

### Fourth Controlled Purchase from WILLIAMS on May 17, 2019

26. On or about May 17, 2019, CI-3 purchased approximately .61 grams of suspected heroin and .61 grams of suspected crack cocaine from WILLIAMS. After having a phone

10

conversation with WILLIAMS discussing the transaction, CI-3 met WILLIAMS in the alley behind the PREMISES where the purchase took place. The suspected heroin and crack cocaine from this controlled purchase were not field tested and results are pending with the DEA laboratory.

### Fifth Controlled Purchase from WILLIAMS on June 11, 2019

27. On June 11, 2019, CI-3 purchased approximately .49 grams of suspected heroin and .47 grams of suspected crack cocaine from WILLIAMS. Prior to making the purchase, CI-3 drove down Barton Avenue and was greeted by WILLIAMS in the area of 2003 Barton Avenue, where CI-3 placed an order for narcotics. WILLIAMS walked away from CI-3's vehicle and was observed on video surveillance entering and exiting the shed behind 2003 Barton Avenue. WILLIAMS then returned to CI-3's vehicle where the transaction took place. The suspected heroin and crack cocaine from this controlled purchase were not field tested.

### Third Controlled Purchase from WIGGINS on June 19, 2019

28. On or about June 19, 2019, CI-4 purchased approximately 7.82 grams of suspected heroin from Roger WIGGINS. Prior to the purchase, during a series of text message communications between CI-4 and WIGGINS, CI-4 arranged the purchase of heroin from WIGGINS. CI-4 met WIGGINS outside of the PREMISES. Prior to the purchase, WIGGINS left the area and went to the shed behind 2003 Barton Avenue, and then returned to the PREMISES. WIGGINS and CI-4 entered the PREMISES and CI-4 observed WIGGINS mixing and dividing suspected narcotics. WIGGINS and CI-4 conducted the heroin transaction inside the PREMISES. The purchased heroin was field tested using a Tru Narc machine. The third attempted field test using the Tru Narc machine showed a positive result for the presence of heroin.

Sixth Controlled Purchase from WILLIAMS on June 27, 2019

29. On June 27, 2019, CI-4 purchased approximately 2.68 grams of heroin from WILLIAMS. Prior to the purchase, during text message communications, CI-4 arranged the purchase of heroin from WIGGINS. On June 27, 2019, prior to meeting with law enforcement, CI-4 spoke with WIGGINS on the phone. WIGGINS advised he was in New York, that he had taken his dad (GIBBONS) up there to get some things straight, and told CI-4 to go see "Rick." CI-4 then went to the area of the PREMISES where he met with WILLIAMS. The purchase of the suspected heroin took place inside of the PREMISES.

## CONCLUSION

30. Based upon the foregoing, I submit there is probable cause to believe that Roger WIGGINS and Richard WILLIAMS have engaged in a conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a) and 846, and that the property described in Attachment A, contains evidence, contraband, fruits, and/or instrumentalities of these criminal activities, as described in Attachment B.

Respectfully submitted,

_____
Kathryn Simmons
Special Agent (ATF)

Subscribed and sworn to before me on July 16, 2019

/S/
David J. Novak
United States Magistrate Judge
_____
The Honorable David J. Novak
United States Magistrate Judge

12

## ATTACHMENT A

*Place to be searched*

The property to be searched is 2107 North Avenue, Richmond, Virginia 23222 in the Eastern District of Virginia ("PREMISES"). The PREMISES is a two-story family dwelling and is the third house on the right hand side of North Ave, just after a vacant lot, traveling north from E Roberts St to E Battery St. The PREMISES is constructed of beige in color siding with white trim and a porch with black handrails along the front side. The numbers "2107" are displayed on the right side of a white front door:



## ATTACHMENT B

*Items to be Seized*

All items constituting evidence and/or instrumentalities of violations of 21 U.S.C. §§ 841(a) and 846 (conspiracy to distribute a controlled substance), including, but not limited to, the following:

a. Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b. U.S. currency and other illicit gains from the distribution of firearms and/or controlled substances;

c. Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of firearms;

d. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

e. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks, safety deposit box keys and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, firearms and/or controlled substances;

f. Documents and papers evidencing ownership of firearms, possession of firearms, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, gun safes, and strong boxes;

g. Photographs, in particular, photographs of firearms and/or controlled substances and photographs of individuals possessing firearms and/or controlled substances and photographs showing the association of individuals;

h. Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

i. Firearms, including, but not limited to, firearms parts, accessories, holsters, and ammunition.